J-S92030-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: R.A.W. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.W., FATHER | |
| | No. 1202 WDA 2016 |

Appeal from the Order Entered July 18, 2016
In the Court of Common Pleas of Blair County
Civil Division at No(s): No. 2015 AD 60

BEFORE: SHOGAN, J., MOULTON, J., and STRASSBURGER, J.[*]

MEMORANDUM BY MOULTON, J.:                    **FILED JANUARY 23, 2017**

M.W. ("Father") appeals from the order entered July 18, 2016 in the Blair County Court of Common Pleas denying Father's petition to involuntarily terminate the parental rights of K.H. ("Mother") to their child R.A.W. ("Child"), born in July 2006. We affirm.

On December 4, 2015, Father filed the instant petition for involuntary termination of Mother's parental rights. Father and Mother are Child's biological parents. A hearing on Father's petition was held on April 13, 2016. At the hearing, the trial court heard testimony from Father, Father's wife J.W., and Mother. On July 18, 2016, the trial court denied Father's petition. On August 11, 2016, Father filed a timely notice of appeal.

_____

[*] Retired Senior Judge assigned to the Superior Court.

The trial court thoroughly set forth its factual findings, which we adopt and incorporate herein. *See* Trial Court Op., 7/18/16, at 2-9, 17-24.[1]

Father raises the following issue on appeal:

> Whether or not the Termination Court erred by determining that the Appellee has not evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties[.]

Father's Br. at 3.

We consider Father's appeal mindful of our well-settled standard of review:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; [*In re R.I.S.*, 36 A.3d 567, 572 (Pa. 2011)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel–Bassett v. Kia Motors America, Inc.*, [613] Pa. [371], 34 A.3d 1, 51 (2011); *Christianson v. Ely*, 575 Pa. 647, 838 A.2d 630, 634 (2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

_____

[1] We note that on p. 3 of the trial court's opinion, the court twice uses the initials "M.H." After review of the record, we conclude that this was a typographical error, and that this refers to Child's Father, M.W. *See* Trial Court Op. at 3.

> As we discussed in **R.J.T.**, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. **R.J.T.**, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. **In re Adoption of Atencio**, 539 Pa. 161, 650 A.2d 1064, 1066 (1994).

**In re Adoption of S.P.**, 47 A.3d 817, 826-27 (Pa. 2012).

Termination of parental rights is governed by section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, which requires a bifurcated analysis. We have stated:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

**In re L.M.**, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). The petitioner has the burden "to prove by clear and convincing evidence that [the] asserted [statutory] grounds for seeking the termination of parental rights are valid." **In re R.N.J.**, 985 A.2d 273, 276 (Pa.Super. 2009). "Clear

and convincing evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." ***In re R.I.S.***, 36 A.3d 567, 572 (Pa. 2011).

Father focuses on Mother's history of drug use and incarceration in support of his claim that he established, by clear and convincing evidence, the statutory grounds for termination of her parental rights to Child under sections 2511(a)(1) and (2).[2] In particular, Father contends that Mother's sporadic contact with Child during her incarceration reflected both "a settled purpose of relinquishing her parental claim to the child" and a "fail[ure] to perform her parental duties," and that her "repeated incapacity and

_____

[2] Sections 2511(a)(1) and (2) provide:

> **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(1), (2).

incarceration has caused the child to be without essential parental care, and it does not seem to be able to be remedied by the parent." Father's Br. at 8; *see* 23 Pa.C.S. § 2511(a)(1), (2). The trial court carefully and thoroughly addressed these claims in its opinion, not only applying the relevant law but also making credibility determinations concerning Mother's efforts to remain in contact with Child while incarcerated as well as Mother's ability to remedy her prior incapacity. While Father argues for a different reading of the facts, we will not disturb the trial court's findings, as they are fully supported by the record. In sum, we conclude that the trial court did not abuse its discretion in finding that Father "failed to establish by 'clear and convincing evidence' that the termination of [Mother's] parental rights is warranted." Trial Ct. Op. at 17. We agree with and adopt its reasoning.[3] *Id.* at 17-24.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/23/2017

---

[3] We note that because the trial court determined that Father failed to prove that Mother's conduct satisfied the statutory grounds for termination in section 2511(a), it was not required to and, accordingly, did not address the considerations set forth in section 2511(b).

IN THE COURT OF COMMON PLEAS OF BLAIR COUNTY, PENNSYLVANIA

IN RE:   R.A.W.

                             :

                             :      NO. 2015 AD 60

                             :

| | |
|---|---|
| HON. WADE A. KAGARISE | PRESIDING JUDGE |
| PHILLIP O. ROBERTSON, ESQUIRE | COUNSEL FOR PETITIONER |
| MARYANN JOYCE BISTLINE, ESQUIRE | COUNSEL FOR RESPONDENT |
| TERRESSA GEORGE, ESQUIRE | GUARDIAN AD LITEM |

## OPINION

**Date: July 18, 2016**

In this matter, the Court has been asked to engage in the task of the resolution of the Petition for Involuntary Termination of Parental Rights that has been filed by the Petitioner regarding a minor child R.A.W., born July ██, 2006.

**PROCEDURAL HISTORY:**

As indicated above, the subject child was born on July ██ 2006. The Petitioner M.W. is the biological father of the subject child. The Respondent K.H., is the biological mother. The Petition for Involuntary Termination of Parental Rights in this matter was filed on December 4, 2015. By Order dated December 8, 2015, Attorney Terressa George was appointed Guardian Ad Litem for the child. The Court entered an Order on December 16, 2015 appointing Maryann Joyce Bistline to represent K.H. A hearing on the termination of parental rights was originally scheduled for March 7, 2016. However, counsel for the Mother was unavailable on that date.

1

As a result, the hearing on the Petition for Involuntary Termination of Parental Rights was rescheduled for April 13, 2016 at 8:30 a.m. The hearing occurred to its conclusion on that date. At the close of the evidentiary hearing, the Court provided to the parties the opportunity to file written arguments and/or briefs in support of their positions. The Court directed the Guardian Ad Litem counsel to present certain opinions about the case on the record at the close of the evidentiary hearing. The Court also provided the Guardian Ad Litem counsel the opportunity to file additional written opinions. The Guardian Ad Litem filed a brief on June 7, 2016. The Petitioner M.W. filed a brief in support of his position on June 17, 2016. The Respondent K.H. filed a brief on July 1, 2016. This matter is now ripe for disposition.

## FACTUAL HISTORY:

The Petitioner M.W. presented testimony at the evidentiary hearing. M.W. testified that he lives in Tyrone with his wife, J.W. and their four children. M.W. works as a salesman at Mattress Warehouse. His wife, J.W., works as an assistant manager at Dollar General. The four children that reside in the home are C████████ age 12, R██████ age 9, E██████ age 3, and the subject child. C████████ and R██████ are not the biological children of M.W. They are the biological children of his wife J.W. E██████ is the biological child of the Petitioner and his wife J.W.

M.W. testified that the biological mother of the subject child is K.H. He testified that there was a previous custody order in effect but it has now been suspended as a result of a December order. This December order was issued as a result of the filing of the within Petition. M.W. testified that the custody order was not being followed due to the fact that K.H. had been in several different places as a result of being in prison for what he believes were drug charges.

2

M.W. testified that he lived with K.H. and the subject child until December 2008. M.W. and K.H. separated in 2008. After the separation, the subject child lived with the Respondent K.H.

In October 2012, M.W. testified that he received custody of the subject child due to K.H.'s father contacting him because the Mother had been arrested. The testimony at the evidentiary hearing established that the Mother was arrested for conspiracy to manufacture and distribute heroin. The testimony established that Levi Holland was manufacturing and selling heroin out of her residence. Furthermore, the evidence established that K.H. had been using heroin for four months.

M.W. testified that he has been the primary caregiver of the child since October 2012. M.W. testified that K.H. was in the Blair County Prison for a few months at the end of 2012. She was released in February or March of 2013. During the initial period of incarceration, there were some telephone calls between the child and K.H. When K.H. was released in February or March 2013, M.W. testified that she was out of prison for approximately six months. During this six month period, M.W. testified that K.H. exercised custody pursuant to a custody order where she would receive two weekends in a row with the subject child and then he would receive one weekend. The other periods of custody would be with M.H. It appears from M.H.'s testimony that this custody arrangement was governed by a custody order that was entered based on the parties' agreement. M.W. testified that the Mother was consistent with her weekend periods of visitation at that time. Around the time of September 2013, K.H. was incarcerated again as a result of what M.W. believes was a parole violation. M.W. testified that K.H. went into the state correctional system and remained there until November 2015.

M.W. testified that while K.H. was incarcerated from September 2013 until November 2015, there was no physical contact between K.H. and the subject child. When asked if there

was phone contact between the child and K.H., M.W. testified that occasionally there were a few calls here and there but no telephone calls on a consistent basis. Upon questioning by Guardian Ad Litem counsel, M.W. approximated that there were approximately fourteen to seventeen telephone calls. M.W. indicated that the approximate fourteen to seventeen calls were not concentrated during any particular period of K.H.'s incarceration. M.W. testified that when K.H. would call, they would allow K.H. to talk to the subject child unless the subject child began to get upset or there would be some type of argument between he and K.H. M.W. testified that K.H. did not send any Christmas or birthday gifts during this period of time. M.W. testified that she did send a few letters "here and there". Upon questioning by Guardian Ad Litem counsel, M.W. testified that he believes there were approximately two cards sent but he did not know how many letters. He later testified that he would approximate that there were ten letters. M.W. testified that he would provide some of the letters to the subject child but some he would not provide to her depending on how he believed the child would react to the letters and whether or not the child wanted to read the letters. M.W. testified that he had told the subject child that K.H. was in prison. He explained that if the child seemed to be doing well with the lack of contact from the Mother, he would not provide the letters.

M.W. testified that from July 2015 to November 2015 K.H. was in a halfway house in Pittsburgh. During this period of time, M.W. testified that there were no calls or gifts. M.W. testified that in the six months prior to the filing of the Petition for Involuntary Termination of Parental Rights, K.H. did nothing to be a parent to the child. M.W. testified that the bond between the subject child and his wife J.W. is good. He testified that he has been married to J.W. for approximately five years and that he has been in a relationship with J.W. since 2009. M.W. testified that there is no bond between the subject child and K.H. but there is a bond

4

between his wife J.W. and the subject child. He testified that K.H. has also not provided any financial support for the child. M.W. testified that the subject child now calls his wife J.W. "Mom". M.W. testified that he believes that it would be in the child's best interest to have K.H.'s parental rights terminated. M.W. testified that the child does well in school and has a good attendance record.

Upon questioning by Respondent and Guardian Ad Litem counsel, M.W. testified that after his filing of the Petition for Involuntary Termination of Parental Rights on December 4, 2015, he obtained a Court Order dated December 10, 2015 that suspended Respondent's periods of custody until disposition of the Petition for Involuntary Termination of Parental Rights. M.W. testified that in the period of time from K.H.'s release from prison in November 2015 until the December 10, 2015 Order suspending K.H.'s periods of custody that K.H. left a message attempting to talk to the subject child on Thanksgiving and also talked to the child by telephone on December 8, 2015. During his testimony, M.W. approximated that K.H. talked to the subject child anywhere between two and four times after her release from the halfway house but prior to the filing of the suspension of her custody rights. Counsel indicated that K.H.'s release from the halfway house occurred on November 20, 2015.

M.W.'s wife, J.W., also provided testimony at the evidentiary hearing. J.W. testified to even less contact between K.H. and the subject child. J.W. testified that if there were any calls between K.H. and the subject child there was very little calls. She testified that she only recalled three or four letters being sent from K.H. to the child. Her testimony indicated that on each occasion the child was given the letters and the child responded to the letters. She recalled only one card being sent to the child from K.H. which was a birthday card in or around July 2014. She testified that she believed that the letters that were sent from K.H. to the child occurred at the

5

beginning of her incarceration when she was in the Blair County Prison. J.W. testified that there has not been any physical contact between K.H. and the child and that she doesn't recall any phone calls between K.H. and the child after her release from incarceration in November 2015. J.W. testified that her bond with the child is very good and that it would be her intent to adopt the child if the Petition for Termination of Parental Rights is granted. J.W. testified that she helps the child with her homework and takes her to activities and indicated that she is like a mom to the child.

The Respondent K.H. also provided testimony at the evidentiary hearing. K.H. testified that she currently lives on Bell Avenue in Altoona. She plans to move to a residence on Cherry Avenue where she will live alone. She described her incarceration history indicating that she was arrested on October 7, 2012. She was incarcerated until February 2013. She was released on bail at that time and remained out of prison until May 2013. In May 2013 she was sentenced to the Blair County Criminal Court's Drug Court. She remained free until September 4, 2013. On this date she was re-incarcerated as a result of what she indicates was her only Drug Court violation. She testified that this violation occurred when she gave another individual in Drug Court her prescription medication. This violation resulted her in entering the Department of Corrections State Intermediate Punishment Program on October 22, 2013. She was sent to Muncy State Prison in November 2013. She remained incarcerated until November 2015. She is currently serving a ten year period of probation. She testified that this probation can be terminated after five years if she successfully abides by the terms and conditions of her supervision.

K.H. testified that at the early stages of her incarceration when she was in the Blair County Prison she would attempt to contact the child by telephone two times per week. She

6

testified that she had little money due to the fact that she had no financial support from her family and was unable to make additional calls. She testified that once she went to the state correctional institution she would attempt to call the child four or five times a week. She attempted to reach the child through contacting J.W.'s telephone number as that was the telephone number she was directed to utilize. She testified that approximately once every two weeks J.W. would answer the telephone.

K.H. testified that she also sent letters to the subject child while she was in the state correctional institution system. She indicated that she would send two to three letters per month and that she would also send cards to the child every Christmas, Easter and on the child's birthday. She testified that she only received two letters back from the child during her time in state prison. K.H. testified that once she was released from the state correctional institution and sent to a halfway house in Pittsburgh in July 2015 she attempted to contact the subject child by telephone every day between the hours of 5:00 p.m. and 7:00 p.m. During her testimony she was able to recall J.W.'s cell phone number. She testified that approximately once every other day J.W. would answer the telephone during this period of time. However, J.W. would make excuses on why she could not talk to the child. She said she was unable to leave Pittsburgh and therefore couldn't see the child in person and she testified that the Petitioners would not bring the child to see her. K.H. testified that her attempts to contact the child continued after her release from the halfway house in November 2015. She testified that she attempted to call the Petitioner and/or his wife every day but only was able to talk to her on two or three occasions. She testified that she asked the Petitioner and his wife if they were willing to place the previous custody order back into effect and allow her to see the child. K.H. testified that this conversation happened around the period of December 4th or 5th. Her testimony indicated that the Petitioner and his wife

7

indicated that they were not willing to do that, that she would see them in court, and that she was causing the child to be emotionally distraught.

K.H. also testified that she objected to the entry of the December 2015 Order suspending her custody rights. K.H. testified that her mother received the paperwork for the special relief hearing only a day or two before the hearing on the special relief. She was unaware of the special relief hearing prior to that time. K.H. testified that she was served with a copy of the Petition for Termination of Parental Rights at the special relief hearing by petitioner's counsel. K.H. testified that she acknowledges her mistake of getting drug charges and wishes to slowly reintegrate herself back into the subject child's life. K.H. indicated that since her release from incarceration she voluntarily enrolled herself in two different programs with Home Nursing in Altoona and successfully completed the programs. K.H. indicated that she was clean three and a half years as of April 4, 2016. K.H. testified that she made one partial payment of child support in the amount of $35.00 and that it was her understanding that the support order was set to be placed on hold due to a disability preventing her from being able to work. K.H. testified that a heart valve issue and anxiety are the reasons for her disability. She did not file any contempt petitions against the Petitioner because she did not believe that her situation would appear to be stable enough to do so.

The parties admitted several exhibits into the record at the evidentiary hearing and presented testimony regarding those exhibits. Petitioner's Exhibit No. 1 is a copy of the December 10, 2015 Court Order of the Honorable Judge Timothy M. Sullivan. This Order makes clear that the Court is granting the Petition for Special Relief and suspending the Mother's custody rights. However, the Order states that this is being done in light of the Father's filing of a Petition for Involuntary Termination of Parental Rights. The Order indicates that the Court is

8

not making any specific findings or assessing any fault. Petitioner's Exhibits 2 through 6 are copies of Verizon telephone records for M.W. and J.W. At the hearing below M.W. presented testimony regarding these exhibits. His testimony was that these records establish telephone calls that were made (or not made) by K.H. to his cell phone or to J.W.'s cell phone. His testimony revealed that during some of the time periods there was as little as one or two calls made and during at least one of the periods of time that there were six telephone calls made. It appears that these were presented to establish that the calls were much less often than the calls asserted by K.H. in her testimony. Despite the admission of the records, M.W. testified that he was unaware of whether or not the records included calls that were made and not answered or whether the records only included calls that were made that were answered. He also indicated that he doesn't know if the records detail calls that would have went to voicemail. Respondent K.H. presented Respondent's Exhibit No. 1. Respondent's Exhibit No. 1 was a letter written by M.W. and J.W. to K.H. dated February 16, 2015. The exhibit also included a February 9, 2015 letter that K.H. sent to the subject child and a February 16, 2015 letter that the child returned to K.H.

## APPLICABLE LAW:

It has long been recognized that a parent possesses a basic constitutional right to the care, custody, and control of his or her child. *Skinner v. Oklahoma*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). Accordingly, the termination of parental rights is "one of the most serious and severe steps a court can take." *In re Adoption of Sarver*, 444 Pa. 507, 281 A.2d 890, 891 (1971). Nevertheless, a parent's right may be terminated if he or she fails to fulfill his or her parental duties to the child. *In re B., N.M.*, 856 A.2d 847, 856 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d

9

100 (2005). This right may be terminated if the child does not receive either proper parenting or care in a permanent, safe, or healthy environment. *Id.* Due to the gravity of the right at stake, the court takes a careful look at each case, examining its individual circumstances and considering all explanations offered by the parent, to determine whether the totality of the circumstances warrants an involuntary termination of parental rights. *In re R.I.S.*, 614 Pa. 275, 36 A.3d 567, 572 (2011) (citing *In the Matter of the Adoption of Charles E.D.M.*, 550 Pa. 595, 708 A.2d 88, 91 (1998)).

The Adoption Act governs who may bring a petition and what the petition must contain so as to terminate parental rights. Strict adherence to the Adoption Act is a prerequisite to the court's jurisdiction to hear a petition to terminate parental rights in connection with a proposed adoption. *In re Adoption of J.F.D.*, 782 A.2d 564, 565 (Pa.Super. 2001). Section 2512 states:

> (a) Who may file.—A petition to terminate parental rights with respect to a child under the age of 18 years may be filed by any of the following:

> (1) Either parent when termination is sought with respect to the other parent.

> (2) An agency.

> (3) The individual having custody or standing in loco parentis to the child and who has filed a report of intention to adopt required by section 2531 (relating to report of intention to adopt).

> (4) An attorney representing a child or a guardian ad litem representing a child who has been adjudicated dependent under 42 Pa.C.S. § 6341(c) (relating to adjudication).

10

(b) Contents.—The petition shall set forth specifically those grounds and facts alleged as the basis for terminating parental rights. The petition filed under this section shall also contain an averment that the petitioner will assume custody of the child until such time as the child is adopted. If the petitioner is an agency it shall not be required to aver that an adoption is presently contemplated nor that a person with a present intention to adopt exists.

23 Pa.C.S.A. § 2512

Assuming the petition meets the above threshold requirements, the court may then consider the underlying procedural requirements and merits of a request to terminate a parent's rights.

The party seeking the termination of parental rights bears the burden of proof in showing the grounds for termination. *In re R.I.S.*, 614 Pa. 275, 36 A.3d at 572. Specifically, for a court to terminate a parent's rights, the petitioning party must prove the asserted grounds for termination by clear and convincing evidence. *Id.* Clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa.Super. 2003).

The petitioning party is charged with satisfying the following two-part test to warrant the termination, which the court considers in a bifurcated manner prior to terminating parental rights:

"Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child."

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007).

11

Section 2511 (a)-(b) provides in pertinent part:

>    (a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

>>    (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing a parental claim to a child or has refused or failed to perform parental duties.

>>    (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

>    (b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

Pursuant to Section 2511(a) (1), the statutory ground for termination is met "if the parent either demonstrates a settled purpose of relinquishing parental claim to a child *or* fails to perform parental duties" for a duration of at least six months. *In re C.M.S.*, 832 A.2d 457, 462 (Pa.Super. 2003), *appeal denied*, 580 Pa. 687, 859 A.2d 767 (2004) (emphasis added). The Pennsylvania Supreme Court has explained that parental duty "is best understood in relation to the needs of a

12

child." *In re J.T.*, 983 A.2d 771, 777 (Pa.Super. 2009) (quoting *In re Burns*, 474 Pa. 615, 379 A.2d 535, 540 (1977)).

> "A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance. This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child. Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life."

*Id.; In re C.M.S.*, 832 A.2d at 462.

While termination will not occur when parental absence is truly a result of circumstances outside of a parent's control, a parent must use all available resources to preserve the parent-child relationship. Moreover, a parent must exercise reasonable firmness in resisting obstacles that may threaten to impede the parent-child relationship. *In re Shives*, 525 A.2d 801, 803 (Pa. 1987). The Commonwealth's courts have repeatedly recognized that "parental rights are not preserved...by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her immediate physical and emotional needs." *In re C.M.S.*, 832 A.2d at 462 (citing *In re Adoption of Godzak*, 719 A.2d 365, 368 (Pa.Super 1998)).

Upon finding either a settled purpose of relinquishing parental rights or a failure to perform parental duties, the court must then consider the following three factors: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and child; and lastly (3) consideration of the effect of the termination of parental rights on the child pursuant to Section 2511(b). *In re Adoption of Charles E.D.M.*, 708 A.2d at 92.

13

Pursuant to the first prong, the court must consider a parent's explanation for the apparent abandonment. Consideration should also be paid to any situations in which the custodial parent "has deliberately created obstacles and has by devious means erected barriers intended to impede free communication and regular association between the non-custodial parent and his or her child." *In re Shives*, 525 A.2d at 803. The pertinent inquiry is not the degree of success a parent may have had in reaching his or her child, but whether, under the circumstances, the parent employed all available resources to preserve the parent-child relationship. *Id.* (citing *In re Adoption of Faith M.*, 509 Pa. 238, 501 A.2d 1105, 1108 (1985)). Parental duty certainly does not require the impossible, but may require that which is difficult and demanding. *In re Burns*, 474 Pa. 615, 379 A.2d 535, 541 (1977). For instance, a *temporary* delegation of parental duties to a suitable caregiver during a crisis may constitute evidence of responsible parenting. *Petition of Lutheran Children and Family Service of Eastern Pennsylvania*, 456 Pa. 429, 321 A.2d 618, 620 (1974). However, a parent's failure to communicate with a child due to drug addiction or even participation in a drug rehabilitation program may not be excused if it occurs over a lengthy period. *In Interest of Q.J.R.*, 664 A.2d 164, 166-67 (Pa.Super. 1995) (affirming termination of mother's rights when she did not personally or verbally contact child for over fourteen months due to her drug addiction and treatment).

In accordance with the second prong, the court must examine the parent's post-abandonment conduct to determine whether the parent attempted to reestablish a parent-child relationship. 23 Pa.C.S.A. § 2511(b). Taken alone, past incapacity is not sufficient to warrant termination; there must be evidence of a parent's present incapacity to parent the child. *In re Adoption of A.N.D.*, 520 A.2d 31, 35 (Pa.Super. 1986). Nonetheless, a child cannot be put "on hold" until the parent finds it convenient to communicate and care for the child. *In re D.J.S.*, 737

14

A.2d 283, 286-87 (Pa.Super. 1999). Merely because a parent experienced a renewed interest in cthe child after the six-month statutory period had elapsed does not necessarily bar termination. *Id.*

Pursuant to Section 2511(b) and as described in the above third prong, the court should consider the nature and status of the emotional bond between the parent and child, with close attention paid to the effect on the child if that bond were to be permanently severed. *In re Adoption of J.M.,* 991 A.2d 321, 323 (Pa.Super. 2010) (citing *In re L.M.,* 923 A.2d at 511). Specifically, the court must determine whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. 23 Pa.C.S.A. § 2511(b). While the emotional bond shared between a parent and child is a major element of the emotional needs analysis, it is only one factor to be considered; the natural attraction between parents and children does not equate to a bond that will necessarily defeat a petition to terminate parental rights. *In re N.A.M.,* 33 A.3d 95, 104 (Pa.Super. 2011). In situations in which there is no evidence of a bond between parent and child, it is reasonable to infer that no bond exists. *In re Adoption of J.M.,* 991 A.2d at 324 (Pa.Super. 2010) (citing *In re K.Z.S.,* 946 A.2d 753, 762-63 (Pa.Super. 2008)). After all, Section 2511(b) requires the court to determine what effect breaking an existing parent-child bond will currently have on the child; Section 2511(b) does not ask courts to speculate whether a bond may be formed in the distant future. *In re Adoption of J.M.,* 991 A.2d at 325. Because the Adoption Act seeks to achieve permanency for the child, the focus must be on the present rather than on the uncertain future. As a result, the court cannot consider any efforts made by a parent to remedy conditions supporting termination when taken subsequent to the filing of the petition. *In re D.W.,* 856 A.2d 1231, 1234 (Pa.Super. 2004).

15

In addition to emotional needs, consideration must also be given to the child's developmental and physical needs. A parent's rights may not be terminated solely on the basis of medical care or other environmental factors, including inadequate housing, furnishings, income, or clothing, provided those factors are deemed outside of the parent's control. 23 Pa.C.S.A. § 2511(b). A parent's rights further may not be terminated simply because the child may encounter greater advantages in another home. *In re Anderson*, 464 A.2d 428, 431 (Pa.Super. 1983).

Contained within the Section 2511(b) analysis of the needs and welfare of the child, the court must also address and evaluate whether the proposed adoption is in the child's best interests. *In re E.M.I.*, 57 A.3d 1278, 1287 (Pa.Super. 2012) (citing *In re Adoption of L.J.B.*, 610 Pa. 213, 18 A.3d 1098 (2011)). Intangible benefits, such as the love, comfort, security, and stability that the child may experience with the adoptive parent, should also be considered in this needs and welfare inquiry. *In re A.S.*, 11 A.3d 473, 483 (Pa.Super. 2010). Based on the totality of the circumstances from the above inquiries, the court must then determine whether an involuntary termination of parental rights is warranted.

There are differences in the applicable law and analysis for § 2511(a)(1) and § 2511(a)(2). 23 Pa. C.S.A. § 2511 (a)(2) provides that termination of parental rights can occur "when the repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental wellbeing and the conditions and causes of the incapacity abuse, neglect or refusal cannot or will not be remedied by the parent." The Superior Court has stated that this section indicates that parental rights may be terminated on the ground of continued abuse or neglect if three (3) conditions are met: (1) repeated and continued incapacity, abuse, neglect or refusal must be shown; (2) such incapacity, abuse, neglect or refusal must be shown to have caused the child to

16

be without essential parental care, control or subsistence; and (3) it must be shown that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *In re: Involuntary Termination of Parental Rights to E.A.P.*, 944 A.2d 79 (Pa. Super. 2008). The Superior Court in *In re: E.A.P. stated as follows*:

> "Statute authorizing termination of parental rights on ground of continued abuse or neglect does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well being, and therefore, the language and statute should not be read to compel courts to ignore a child's need for a stable home and strong continuous parental ties which the policy of restraint in state intervention is intended to protect, and this is particularly so where disruption of family as already occurred and there is no reasonably prospect for uniting it."

Incarceration, while not a litmus test for termination can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent", *In re: Adoption of S.P.*, 47 A.3d, 817, 830 (Pa. 2012).

## DISCUSSION:

For the reasons outlined herein, we find that the Petitioner has failed to establish by "clear and convincing evidence" that the termination of the Respondent's parental rights is warranted. As stated above, clear and convincing evidence is defined as testimony that is so "clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue". *In Re: J.L.C.*, 837 A.2d, 1247, 1251 (Pa. Super 2003) In this case, we simply find that the Petitioner's evidence does not meet this hefty burden. In examining the basis for termination of parental rights pursuant to 23 Pa.

17

C.S.§2511(a)(1), we do not believe that the testimony has established that the Respondent has evidenced a settled purpose of relinquishing her parental claim or that the Respondent has failed to utilize available resources to preserve the parent/child relationship.

The testimony at the evidentiary hearing portrayed a wide disparity regarding the extent of the contact that the Mother attempted to have with this child. The Petitioner M.W. testified that during K.H.'s incarceration from September 2013 until November 2015 that there was no physical contact between K.H. and the subject child. He then testified that there were approximately fourteen to seventeen telephone calls spread out during the period of time that K.H. was incarcerated. M.W. testified that no Christmas or birthday cards were sent to the child during that period of time. He also approximated that there were approximately two cards sent from K.H. to the child and approximately ten letters. After K.H. was released from incarceration, M.W. testified that K.H. spoke with the child on anywhere between two to four occasions. When M.W.'s wife J.W. testified, she testified that there was very little to no telephone calls made between K.H. and the child. She testified that she believed that there were three or four letters and one card. She recalled that the card was a birthday card in or around July 2014. Contrary to M.W.'s testimony, J.W. testified that every time a letter was sent by K.H. that the letter was given to the subject child and that the child responded to the letter. M.W. testified that the child would not be permitted to receive letters when he and J.W. believed that they would upset the child. J.W. didn't recall any telephone calls between K.H. and the child after K.H.'s release from incarceration in November 2015.

The Respondent K.H.'s testimony provided a completely different picture. She testified that she would make calls to the child at the beginning of her incarceration with calls occurring approximately two times a week and that these calls eventually increased to four or five times a

18

week. She testified that M.W. and J.W. often would not answer the telephone or when they did answer the telephone would not allow her to speak to the subject child. K.H. testified that she also sent letters to the child on two or three occasions every month and would send cards to the child on holidays such as Christmas, Easter and on the child's birthday. K.H. testified that when she was released from the state correctional institution and sent to a halfway house, she would attempt to telephone the child every day. She recalled J.W.'s cell phone number when she testified at the hearing below. She conceded that she did not see the child in person but indicated that the Petitioner would not bring the child to see her at the state correctional institution or at the halfway house. During the period of time after her release from incarceration in November 2015 but prior to the beginning of December 2015 when the Petitioner filed this Petition to Terminate Parental Rights, K.H. expressed a desire to reinstitute the custody order and re-establish herself in the child's life. When K.H. learned that M.W. had filed a Petition for Special Relief in Custody seeking to suspend her periods of custody, K.H. showed up at the Court hearing and objected to her rights being suspended.

Considering the testimony as described above, this Court is unable to conclude that the Petitioner has presented sufficient credible factual testimony to sustain his burden pursuant to the "clear and convincing" standard. We believe that based on the totality of the evidence it is reasonable to conclude that Respondent's actions included consistently telephoning the Petitioner and the child, writing letters to the child and sending cards to the child. We find these actions sufficient to evidence that she desired to maintain the parent/child relationship and did not intend to relinquish her parental claim. K.H.'s actions in attempting to re-establish the custody schedule after her release from incarceration is further evidence of her desire to maintain her relationship with the child. We also note that for the first six years of the child's life the child

19

lived with the Respondent and during the period of time in 2013 when she was not incarcerated she continued to maintain consistent contact with the child pursuant to a custody order.

We likewise believe that the Petitioner has failed to satisfy his burden to prove that termination of the Respondent's parental rights is warranted pursuant to 23 Pa. C.S.§2511(a)(2). An examination of the facts pursuant to §2511(a)(2) is different from the analysis for §2511(a)(1). 23 Pa. C.S.A. §2511(a)(2) requires the Court to consider whether or not the repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for the child's physical or mental well- being and whether the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent. In this particular case, the Petitioner points to the Respondent's incarceration from September 2013 to November 2015 as evidence of her incapacity to provide parental care. The Petitioner also points to Respondent's criminal history and drug abuse. We disagree that these facts are sufficient to warrant termination pursuant to §2511(a)(2) under the facts and circumstances of this case.

We acknowledge that the Respondent was incarcerated on two occasions. Once in late 2012 and early 2013 as a result of being arrested and again in September 2013 for violating the conditions of her supervision. These occurrences did result in her being in prison for over two and a half years. However, it is important to note that while the incarceration was lengthy, the incarceration resulted from her initial arrest and what appears to be her only violation of supervision. This incarceration did not result from multiple criminal violations and multiple periods of incarceration. We also find that the Mother's incarceration did not prevent the subject child from being without essential parental care, control or subsistence in light of the fact that the child was being properly cared for by the biological Father. We also do not believe that the

20

present record suggests that the Mother's incapacity cannot or will not be remedied. We note that the Mother claims that she has been sober for several years. The Petitioner correctly points out that she was incarcerated for a substantial period of this time. Nonetheless, it is reasonable to assume that she was provided certain freedoms during her time in the halfway house. There is no evidence that she has relapsed. There is evidence that she has completed programs to aide her rehabilitation. While there is always uncertainty with any individual who is a drug addict that there may be further drug use or further incarceration, there is nothing in this record to suggest that the Respondent is more at risk than any other drug addict. Therefore, we are unable to conclude that there exists evidence that her incapacity will not be remedied. The Mother is now out of prison and it appears that there are no circumstances that would prevent her from assuming parental duties. Based on the aforementioned facts, we do not believe that the Petitioner has proven by clear and convincing evidence that there is a basis for termination pursuant to 23 Pa. C.S.§2511(a)(2)

The Court believes that it is important to address the written report submitted by Guardian Ad Litem Counsel. We thank the Guardian Ad Litem Counsel for her assistance in this case and wish to note that we found her written arguments well articulated and comprehensive. However, we simply interpret the facts of this case differently than the Guardian Ad Litem. As stated above, we do not believe that the Petitioner has satisfied his burden of proof in this matter. The Guardian Ad Litem Counsel appears to have concluded that the Petitioner's version of facts were proven by clear and convincing evidence. This is a factual conclusion that we are simply unwilling to accept.

In examining the basis for termination pursuant to 23 Pa. C.S.A§2511(a)(2) the Guardian Ad Litem Counsel sites two cases that she indicates are dispositive and applicable to this case.

21

These cases are *In Re: Adoption of S.P.*, 47 A.3d 817 (Pa. 2012) and *In Re: Adoption of E.A.P.*, 944 A.2d 79, (Pa. Super. 2008). Guardian Ad Litem Counsel argues that these two cases are clearly on point with the present case. We must disagree as we find the present facts sufficiently distinguishable from these cases.

In *In Re: E.A.P.* the Superior Court addressed a case wherein the biological mother was incarcerated for a substantial portion of E.A.P.'s life. E.A.P. was first adjudicated dependent at seven months old. The mother was incarcerated more than four times. One of these convictions was for indecent assault which caused the Mother to obtain sexual offender status. At the time of the termination hearing, E.A.P. was ten years old and the mother had only been out of prison for a total of seventeen months of the child's life, having continuously been incarcerated for several years. E.A.P. had suffered from various emotional disorders. At the time of the hearing, the child had not lived with the mother for five years and E.A.P. had been in six different foster homes. The Mother remained incarcerated with an expected parole date several years away. The trial court concluded that the Mother never really provided parental care for the child, the mother remained in prison, and may even be unable to care for the child when she was released due to her untreated sex offender status. The case worker testified at the termination hearing, that the child probably wouldn't even know the mother if she saw her. In *In Re: Adopt of S.P.*, the Pennsylvania Supreme Court reversed a Superior Court ruling which overturned a trial court's determination that a father's parental rights should be terminated. The facts of S.P. established that the biological mother's parental rights had previously been terminated. At the time of the Father's termination hearing, the Father had been incarcerated since prior to the child's birth. He remained incarcerated at the time of the termination hearing with his expected parole speculative. The child in the case suffered from developmental delays which required

22

significant attention by various professionals. It was determined that the child would essentially be in need of constant attention by a caregiver. In addition to the father's parole being speculative, it was also speculative as to whether or not the father would be able to obtain housing, employment or transportation which further presented an issue as to the father's stability to be a parent. The trial court concluded that the father's situation required the child to be presently without essential parental care and control. The trial court also felt that it was speculative as to whether or not the father would have the ability to parent this particular child with the child's special needs especially in light of the fact that the father had never cared for the child.

We believe that the present case is distinguishable in many respects from the cases described above. In this case, the subject child knows the Biological Mother and the Biological Mother has provided parental care for this child for a significant period of the child's life. Another important distinction is that in the present case the Mother has been released from incarceration. The Mother has stable housing and there is no evidence to suggest that she is unable to engage in parental responsibilities. It is also important to note that the present case does not involve a situation where a child is lingering in foster care without parental care, control or subsistence. Both of the cases cited by the Guardian Ad Litem counsel involved agency requests to terminate parental rights to remove a child from foster care.

Having concluded that the Petitioner has not met his burden to establish a basis for termination pursuant to 23 Pa. C.S.A.§2511(a)(1) or (a)(2), the Court need not engage in the best interest analysis required under §2511(b). This analysis is only necessary if a basis for termination exists pursuant to §2511 (a)(1) or (a)(2). If we were to engage in a best interest analysis, the Court believes that the bond that exists between the subject child and J.W. may be

23

particularly relevant. However, it would also be important to consider the history of the relationship between the Respondent K.H. and the subject child which included more than half of the child's life where the Respondent was either the primary caregiver or an equal caregiver to the child. However, in light of our determination that the Petitioner has failed to sustain his burden pursuant to 23 Pa. C.S.A.§2511(a)(1) or (a)(2), we decline to further assess the best interests of the child.

In light of the above, we enter the following Order:

O

R

D

E

R

24